# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 429 | **DATE** | 11/18/2003 |
| **CASE TITLE** | Central Mutual Insurance Co. vs. Stunfence, Inc., et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth in this memorandum opinion and order, StunFence's motion is granted(15-1) and Central's is denied (13-1). This case is set for a status hearing at 9 a.m. November 25, 2003 to discuss the still-open issue as to Central's duty to indemnify StunFence as to part of all of any liability incurred in the now-settled Underlying Action.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | NOV 18 2003 | | 23 |
| | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 11/18/2003 | | |
| | | | date mailed notice | | |
| SN | courtroom deputy's initials | | SN | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL MUTUAL INSURANCE        )
COMPANY,                        )
                                )
            Plaintiff,          )
                                )
    v.                          )    No.  03 C 429
                                )
STUNFENCE, INC., et al.,        )
                                )
            Defendants.         )



## MEMORANDUM OPINION AND ORDER

Central Mutual Insurance Company ("Central") filed this
diversity action against StunFence, Inc. ("StunFence") and Robert
Gilmour (collectively "StunFence"), seeking a declaration that it
had no duty to defend or indemnify them against counterclaims
brought against them by Gallagher Security USA, Inc. and some of
its affiliates (collectively "Gallagher") in Case No. 01 C 9627
in this District Court (the "Underlying Action"). Each side has
sought summary judgment as to Central's duty to defend. For the
reasons set forth in this memorandum opinion and order,
StunFence's motion is granted and Central's is denied.

### Background[1]

Central issued two relevant policies to StunFence in 2001:
(1) as part of a Commercial Lines Policy, its Commercial General
Liability coverage (the "Primary Policy") that obligated Central
to defend StunFence against any suit seeking damages for

---

[1] These facts are culled from the parties' submissions and
are not in dispute.

"personal and advertising injury" and (2) a separate Commercial Excess Policy (the "Excess Policy") under which Central also promised to defend StunFence against any suit for "advertising injury" (those quoted terms are defined and discussed in detail later in this opinion). On February 21, 2002--well within the coverage period--Gallagher filed counterclaims against StunFence in the Underlying Action, charging (among other things) breach of contract, trademark infringement and violation of the Illinois Consumer Fraud statute.

In late 2002[2] StunFence delivered a copy of Gallagher's pleading to Central in the hope that Central would defend it against the charges, but Central refused. Instead Central filed this declaratory judgment action to obtain a determination (1) that Gallagher's factual allegations do not constitute an "advertising injury" as defined by either policy or (2) that one of the exclusions frees Central from its duty to defend. Although the Underlying Lawsuit has since settled, the question whether Central had a duty to defend still remains ripe for decision.

According to Gallagher, it had a contract with StunFence that allowed the latter to sell Gallagher's electrical fence systems to correctional facilities, but StunFence failed to

---

[2] Neither party has raised any issue as to the timeliness of StunFence's notice.

perform its obligations under that contract. In addition
Gallagher charged that StunFence installed fence systems made
with non-Gallagher materials and sold them under Gallagher's
registered trademark "Power Fence," while on other occasions
putting its own StunFence signs on Gallagher's products.
Moreover, StunFence had allegedly represented in industry
periodicals that it developed, introduced and owned the Power
Fence and its related technology. Relatedly, StunFence's website
assertedly touted among other things that its product was "the
world's only virtually false alarm free outdoor security
product"--the same marketing claims that Gallagher has made with
reference to its own product. Gallagher claimed that StunFence
thus "misappropriated [Gallagher's] advertising and promotion
claims," causing harm to Gallagher's reputation and good will.

### Primary Policy

Under the Primary Policy Central promised to defend
StunFence against any suit seeking "personal and advertising
injury," defining that term in Primary Policy §V ¶14 to mean
(only the relevant subparagraphs are listed here):

> injury, including consequential "bodily injury," arising out
> of one or more of the following offenses:
>
> *       *       *
>
> d.  Oral or written publication of material that slanders
>     or libels a person or organization or disparages a
>     person's or organization's goods, products or services;
>
> *       *       *

3

  f. The use of another's advertising idea in your
    "advertisement"; or

  g. Infringing upon another's copyright, trade dress or
    slogan in your "advertisement."

In turn, Primary Policy §V ¶1 defined "advertisement" as "a

notice that is broadcast or published to the general public or

specific market segments about your goods, products or services

for the purpose of attracting customers or supporters." Finally,

Primary Policy §I Coverage B ¶2.a excluded from coverage

"personal and advertising injury" (again only the relevant

subparagraphs are listed):

  1) Caused by or at the direction of the insured with the
    knowledge that the act would violate the rights of
    another and would inflict "personal and advertising
    injury";

  2) Arising out of oral or written publication of material,
    if done by or at the direction of the insured with
    knowledge of its falsity;

      *   *   *

  6) Arising out of a breach of contract, except an implied
    contract to use another's advertising idea in your
    "advertisement";

  7) Arising out of the failure of goods, products or
    services to conform with any statement of quality of
    performance made in your "advertisement"....

### Excess Policy

  In the Excess Policy Central assumed a duty to defend

against any suit seeking "personal injury" or "advertising

injury" damages that were not covered by any other insurance

policy. Excess Policy §VI ¶1 defined "advertising injury"

4

differently than the Primary Policy defined "personal and
advertising injury" (although subparagraph "a" below is identical
to subparagraph "d" in the Primary Policy):

> "Advertising injury" means injury arising out of one or more
> of the following "offenses":
>
> a.    Oral or written publication of material that slanders
> or libels a person or organization or disparages a
> person's or organization's goods, products or services;
>
>             \*       \*       \*
>
> c.    Misappropriation of advertising ideas or style of doing
> business; or
>
> d.    Infringement of copyright, title or slogan.

Excess Policy §I ¶2.p excluded from coverage "personal injury" or
"advertising injury" "[a]rising out of oral or written
publication of material, if done by or at the direction of the
insured with knowledge of its falsity," while ¶2.q excluded:

> Advertising injury" arising out of:
>
> 1)    Breach of contract, other than misappropriation of
> advertising ideas under an implied contract;
>
> 2)    The failure of goods, products or services to conform
> with advertised quality or performance;
>
> 3)    The wrong description of the price of goods, products
> or services....

Unlike the Primary Policy, the Excess Policy did not separately
define what constituted an "advertisement."

### Standards Defining the Duty To Defend

Both sides agree that Illinois law governs this contract
dispute.  And under Illinois law--as probably everywhere

else--courts look to the allegations of a third party's underlying pleading to determine whether an insurer has a duty to defend its insured against that third party's action (United States Fid. & Guar. Co. v. Wilkin Insulation Co., 144 Ill.2d 64, 73-74, 578 N.E.2d 926, 930 (1991). Here Central had a duty to defend StunFence if any of Gallagher's factual allegations even potentially (emphasis in Wilkin, id.) stated a claim that fell within policy coverage--"even if the allegations are groundless, false, or fraudulent" (id.). Where a third party alleges several theories of recovery, as Gallagher did, the insurer's duty is triggered "even if only one such theory is within the potential of the policy coverage" (id.). Lastly, the policy language "must be liberally construed in favor of the insured"--in favor of coverage--and "any doubts and ambiguities must be resolved in favor of the insured" (id.).

## Application of the Standards

To mesh those standards with the language of the two policies at issue, Central had a duty to defend StunFence against Gallagher's counterclaims:

    1. if Gallagher's allegations potentially stated a claim that fit one or more of the enumerated offenses listed in either the Primary Policy or the Excess Policy;

    2. if Gallagher sought recovery for injuries arising from that offense or those offenses; and

6

3. if none of the specified exclusions applies.[3]
StunFence argues for coverage under two separate "offenses"
listed in the Primary Policy (or the corresponding provisions in
the Excess Policy)--"Infringing upon another's copyright, trade
dress or slogan in your 'advertisement' and "The use of another's
advertising idea in your 'advertisement.'"

StunFence addressed the second of those two provisions only
in its responsive memorandum, aside from a one-line assertion in
its opening memorandum that was unaccompanied by any factual or
analytical support. Ordinarily such perfunctory treatment in its
initial memorandum might bar StunFence from later raising the
"use of another's advertising idea" as an independent ground for
summary judgment (330 W. Hubbard Rest. Corp. v. United States,
203 F.3d 990, 997 (7th Cir. 2000)). But under the circumstances,
Central can hardly claim that it was taken by surprise or that it
did not have an adequate opportunity to argue or present evidence
on the issue. Central argued (unconvincingly) in its own opening
memorandum that the phrase "misappropriation of advertising ideas
or style of doing business" (the corresponding language in the
Excess Policy) did not give rise to a duty to defend trademark
infringement claims. And Central could have sought leave to file

---

[3] Winklevoss Consultants, Inc. v. Fed. Ins. Co., 991 F.
Supp. 1024, 1030-31 (N.D. Ill. 1998) applied a somewhat similar
test, but it listed factors that were uniquely related to the
policy at issue in that case and that are not at all applicable
here.

a reply memorandum if it felt sandbagged.

Moreover, if this Court were consequently to deny both motions for summary judgment, where would that leave the matter? After all, the only dispute in this case involves an issue of contract interpretation--there are no disputed issues of fact. In other words, the parties' cross-motions are correct: There is nothing to submit to a jury. And it is this Court's obligation to interpret the contracts--the two policies--in their entirety, without turning a blind eye to any obviously relevant provision.

This opinion will therefore also evaluate the issue whether Gallagher's allegations fit within the provision in question--and if Central has anything truly meaningful to add by way of argument or otherwise, it may file a timely motion for reconsideration. Of course, StunFence could have made everything a great deal easier if it had made the argument in a full-blown manner in its opening memorandum.

But because StunFence occupies a considerable portion of its memoranda in arguing that the "trade dress" coverage of the Primary Policy gave rise to Central's duty to defend, that provides as good a place as any to start. StunFence suggests that the policy covers all trademark claims by its inclusion of "trade dress" claims, because the same legal analysis is used to resolve both types of claims.

Frankly, that contention makes no sense. While the term

8

"trademark" is sometimes employed "in a broad and generic sense to denote the entire field of trademarks, service marks, trade names, and trade dress" (Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc., 149 F.3d 722, 726 n.1 (7th Cir. 1998)), the term "trade dress" alone denotes only a subset of trademark law. StunFence's premise amounts to urging instead that the lesser ("trade dress") includes the greater (trademark infringement generally)--a neat trick, but at war with normal usage. Just because courts apply essentially the same type of legal analysis to the two concepts in no way implies that the parties to the Primary Policy intended to treat the concepts as identical in scope.

In fact, StunFence's argument runs exactly opposite to the familiar canon expressio unius est exclusio alterius.[4] Furthermore, it ignores the fact that in 1998 the Insurance

---

[4] As Lord Justice Lopez, quoted in Ford v. United States, 273 U.S. 593, 612 (1927), said of that maxim:

It is often a valuable servant, but a dangerous master to follow in the construction of statutes or documents.

Others since have also criticized its use as opportunistic or contextually limited (see, e.g., Black's Law Dictionary 602 (7th ed. 1999), quoting Richard Posner, The Federal Courts: Crisis and Reform 282 (1985) and his reference to a 1983 Supreme Court opinion. All the same, no lesser authority than a unanimous Supreme Court, speaking through Chief Justice Rehnquist, has chosen more recently than the Posner article to use the maxim to good advantage in Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993). In any event, StunFence misses the mark entirely by attempting to stand the maxim on its head.

9

Services Office ("ISO"), the organization that accepts responsibility for drafting the Primary Policy, changed the definition of "advertising injury" from "[i]nfringement of copyright, title or slogan" to "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement'" (5 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition ["McCarthy"] §33:5, at 33-10 to 33-11 (4th ed. 2003)). While the historical evolution of the "advertising injury" section of the Primary Policy is certainly not entitled to conclusive weight in interpreting the policy provision (see Rhone-Poulenc Inc. v. Int'l Ins. Co., 71 F.3d 1299, 1304 (7th Cir. 1995)), it is clearly significant that the ISO made the change from "title" to "trade dress" and not "trademark" after there was a clear trend in most courts to recognize that the term "title" included trademark infringement claims (5 McCarthy §33:9).[5]

That however does not dispatch the "trade dress" issue entirely: StunFence also contends that even if the term does not

---

[5] Because the Excess Policy kept the older definition of "advertising injury" and provided coverage for "infringement of title," Gallagher's trademark infringement claims would be covered under that provision in the Excess Policy if Illinois law followed that majority trend. First State Ins. Co. v. Alpha Delta Phi Fraternity, No. 1-94-1050, 1995 WL 901452, at *12 (Ill. App. 1st Dist. Nov. 3) did arrive at that conclusion, but it is an unpublished opinion. Hence Illinois Supreme Court Rule 23 states that it has no precedential value, and the issue therefore remains open under Illinois law. That question need not be decided here, however, because this opinion later finds that in any case the "use of another's advertising idea" language in the Primary Policy gives rise to Central's duty to defend.

10

fully incorporate garden-variety trademark infringement,
Gallagher's allegations nevertheless potentially state a claim
for trade dress infringement as such, thus triggering Central's
duty to defend. That added argument must be evaluated in terms
of the scope of the concept as succinctly stated in AM Gen. Corp.
v. DaimlerChrysler Corp., 311 F.3d 796, 814 (7th Cir. 2002)
(internal quotation marks omitted):

> Trade dress is the total image or overall appearance of
> a product, including size, shape, color, texture, and
> graphics

On that score the closest that Gallagher came to alleging
that StunFence infringed upon the overall appearance of Gallagher
products was its assertion that StunFence put Power Fence signs
on StunFence products and tried to pass off its fences as though
they were Gallagher's.[6] But StunFence makes no effort to explain
how those allegations have any connection with an "advertisement"
as that term is used in the Primary Policy. While some courts
have held that the ordinary meaning of "advertising" may indeed
be quite broad (see, e.g., Charter Oak Fire Ins. Co. v. Hedeen &
Cos., 280 F.3d 730, 736-37 (7th Cir. 2002)), the Primary Policy
limited that term to notices that are "broadcast or published...
for the purpose of attracting customers or supporters." Arguably

---

[6] Gallagher has not asserted that the overall appearance of
its fences was non-functional, which it would have had to
demonstrate to recover under trade dress infringement (15 U.S.C.
§1125(a)(3); Billy-Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d
586, 593 (7th Cir. 2003)).

some signs (billboards, for example) would fit the policy's definition of "advertising," but it is not apparent from the allegations itself that the signs were intended for purposes of attracting customers or supporters (nor does StunFence make that argument). In sum, no duty to defend arises from StunFence's purported misuse of Power Fence signs on its own products because there is no connection to "advertising" within the Primary Policy's definition.

As for the statements that StunFence supposedly made in industry periodicals and on its website pertaining to the Power Fence name and product, those allegations can properly be characterized as stating only a garden-variety trademark infringement claim, not by any stretch of the imagination a trade dress claim. In essence that argument returns to StunFence's earlier (and already rejected) position that "trade dress" and "trademark infringement" are synonymous. Suffice it to say that while this Court must read the Underlying Action's allegations as broadly as possible, it should not bend those underlying allegations or the Primary Policy's provisions entirely out of shape just to find coverage (see Rohe ex rel. Rohe v. CNA Ins. Co., 312 Ill.App.3d 123, 127, 726 N.E.2d 38, 41 (1ˢᵗ Dist. 2000)). Absent any Underlying Action allegations that allude to the misuse of the overall impression, or of some distinct feature, of StunFence's product, StunFence fails in its attempt

12

to squeeze into the "trade dress" language.

But with all that being said, one can only wonder why StunFence has spent so much effort in trying to fit a square peg in a round hole and so little in advancing the "use of another's advertising idea" language of the Primary Policy. Despite that seeming effort to snatch defeat from the jaws of victory, this Court holds that Gallagher's allegations clearly triggered Central's duty to defend under the latter provision. Two other opinions by this Court's colleagues have held persuasively that the term "misappropriation of advertising ideas or style of doing business" (the language in the Excess Policy) encompasses claims for trademark infringement so long as there is a sufficient nexus between the injury and the injured party's advertising (Flodine v. State Farm Ins. Co., No. 99 C 7466, 2001 WL 204786, at *8-*9 (N.D. Ill. Mar. 1), evaluating Illinois and Colorado law; Winklevoss Consultants, 991 F. Supp. at 1038, applying Illinois law). No reason appears, and Central makes no argument, as to why the use of a trademark is to be included (as it is) within the trademark owner's "advertising idea" for purposes of the older ISO-drafted Primary Policy language but not for purposes of the policy's revised language.

As against that, Central does observe that "misappropriation of advertising ideas of style of doing business" can be interpreted narrowly so as to take trademark infringement claims

13

outside the scope of that coverage. Indeed, some courts have so held by limiting that language to apply only to the state law tort of misappropriation--or the "hot-news" claim, as it was labeled in Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 845 (2d Cir. 1997) (see, e.g., Advance Watch Co. v. Kemper Nat'l Ins. Co., 99 F.3d 795, 804 (6th Cir. 1996); Callas Enters., Inc. v. Travelers Indem. Co. of Am., 193 F.3d 952, 956-57 (8th Cir. 1999)). But for one thing, those decisions are wholly at odds with the principle--firmly embedded in Illinois law--that insurance contracts must be broadly and liberally construed to favor the insured (Wilkin Insulation, 144 Ill.2d at 74, 578 N.E.2d at 930). And more importantly in substantive terms, those decisions are plainly inapplicable in evaluating the revised Primary Policy, for that policy employs the word "use" and not "misappropriation." Under a straightforward reading of the revised Primary Policy language, Central had a duty to defend StunFence if Gallagher claimed (as it did) that it suffered an injury that arose out of StunFence's use of its "advertising idea." In that regard a trademark (a designation affixed to goods to identify their source) easily qualifies as an "advertising idea" under the line of analysis exemplified by Flodine and Winklevoss.

In this instance Gallagher alleged that StunFence used Gallagher's trademark "Power Fence" on its website and made

promotional claims identical to those used by Gallagher in
marketing its own product. Additionally, Gallagher claimed that
StunFence made statements in trade industry periodicals that
StunFence owned and developed the technology and maintained
proprietary rights over that technology--characteristics that
purportedly describe the Power Fence. And of course Gallagher
asserted that it suffered harm as a result of StunFence's
advertising. In combination those allegations are more than
sufficient to generate Central's duty to defend under the Primary
Policy's coverage of injuries arising from the "use of another's
advertising idea in your 'advertising.'"

Central attempts to escape its duties under the Primary
Policy by arguing that <u>Winklevoss</u> somehow established a more
rigorous requirement that "the injury to the underlying plaintiff
must have arisen solely out of the insured's offense committed in
the course of advertising."[7] While <u>Winklevoss</u> did contain
language to that effect, the case makes clear that the
requirement was derived from the policy at issue in that case,
which defined advertising injury as "injury arising solely out of

---

[7] It should of course be said, as our Court of Appeals
periodically reminds us (see, e.g., <u>Bank of Am., N.A. v. Moglia</u>,
330 F.3d 942, 949 (7th Cir. 2003)) that decisions by District
Judges (including this one) do not create precedent--they have
force (if at all) only to the extent that they are innately
persuasive. All the same, the text here demonstrates that
Central seeks to put considerably more weight on <u>Winklevoss</u> than
it can carry analytically.

one or more of the following offenses committed in the course of advertising your goods, products or services" (Winklevoss, 991 F. Supp. at 1030). No such limiting language is to be found in the Primary Policy or the Excess Policy at issue here. Instead Gallagher's allegations that StunFence used the Power Fence trademark and made false representations related to its own product provide a sufficient link between Gallagher's advertising and the injury--and the Primary Policy demands no more.

Each case on which Central attempts to rely to argue that Gallagher's claims do not have a sufficient relationship with advertising shares the characteristic that the complained-of conduct had a tenuous connection at best to advertising, a dramatic contrast with Gallagher's counterclaims in which the connection between the use of Gallagher's advertising idea and the injury is apparent. For example, Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 748 (7th Cir. 1999) found an insufficient connection between the trade secret claims contained in the underlying complaint and any advertising activity. But at the same time Frog, Switch recognized (without deciding) that trademarks are different in that they serve to communicate a message about a marked good or service, "which is the essence of advertising, and therefore allegations of trademark infringement arguably allege misappropriation of an advertising idea" (id. at 749). In this instance Gallagher's counterclaim allegations are

16

not, as Central contends, simply trade secret and contract claims masquerading under the Lanham Act. Rather Gallagher quite plainly charged injuries that arose from StunFence's use of Gallagher's trademark and StunFence's false or misleading statements about the Power Fence product.

Even if Gallagher's alleged trademark infringement claims played a minor role in its counterclaims in relation to what Central characterizes as trade secret and breach of contract claims (something that has not been, but need not be, established here), Central could not run from its duty to defend StunFence. While Illinois cases have said that the underlying complaint (or, as in this case, the counterclaim) "must be read as a whole in order to assess its true nature" (<u>Twin City Fire Ins. Co. v. Somer</u>, 342 Ill.App.3d 424, 431, 794 N.E.2d 958, 964 (1st Dist. 2003)), it would be entirely wrong to extend that general statement to hold that any potential causes of action that are minor in comparison to the overall complaint do not give rise to the duty to defend. Any such result would be at war with the well-settled principle that the duty to defend arises even if only one of the theories of recovery is within the potential coverage of the policy (<u>HFP, L.L.C. v. Gen. Star Indem. Co.</u>, 338 Ill.App.3d 912, 915, 788 N.E.2d 753, 756 (1st Dist. 2003)).

<u>Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.</u>, 43 F.3d 1119 (7th Cir. 1994), though applying Wisconsin

17

law, states the same doctrine that is uniformly expressed and
applied by Illinois courts.  It explains that the underlying
allegations do not need to recite the exact words of coverage or
allege predominantly covered claims to invoke an insurer's duty
to defend (id. at 1122, citations omitted):

> What is important is not the legal label that the plaintiff
> attaches to the defendant's (that is, the insured's)
> conduct, but whether that conduct as alleged in the
> complaint is at least arguably within one or more of the
> categories of wrongdoing that the policy covers....Nor is
> the insurer allowed to escape from his duties of defense and
> indemnification by reference to the core or dominant
> character of the plaintiff's allegations.  That would
> violate the principle that if any of the conduct alleged in
> the complaint falls within the scope of the insurance
> policy, the insurer must defend.  If unfair competition
> within the meaning of the insurance contract is alleged (not
> necessarily by name), it is irrelevant that it is a
> subordinate aspect of the plaintiff's case.

None of the cases that Central cites in claimed support of
its "gist" approach to determining the duty to defend actually
favors or adopts that method--rather they all follow the doctrine
reiterated in such cases as HFP and Curtis-Universal.  For
instance, Central again attempts to point to Frog, Switch, but
that case teaches instead that "if a single claim in a multiclaim
lawsuit is potentially covered, the insurer must defend all
claims until there is no possibility that the underlying
plaintiff can recover on a covered claim" (193 F.2d at 746).
Because Gallagher more than sufficiently alleged a covered
offense, it does not matter whether Gallagher sought to advance
other causes of action that are not covered by the Primary

18

Policy. Central's duty to defend was triggered in any event.

Lastly, Central argues that coverage is precluded by Gallagher's allegations that StunFence acted intentionally and with knowledge that it was violating Gallagher's rights. In that respect it will be remembered that the Primary Policy did exclude from coverage any injuries caused by the insured "with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'" and any injuries "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." But it must also be remembered that exclusions are subject to the same interpretive rule that all ambiguities are resolved in favor of the insured (Outboard Marine Corp. v. Liberty Mut. Ins. Co., 154 Ill.2d 90, 119, 607 N.E.2d 1204, 1217 (1992)). Thus the insurer may refuse to defend only if it is clear from the face of the pleading that all of the allegations in the Underlying Action fall outside of the policy's actual or potential coverage (Wilkin Insulation, 144 Ill.2d at 74, 578 N.E.2d at 930).

In this instance the quoted exclusions do not negate Central's duty to defend. Contrary to Central's vigorous assertion, 15 U.S.C. §1114 ("Section 1114") does not uniformly require that infringements be committed with knowledge. In that regard it is troubling that Central quotes only Section

19

1114(1)(b)--which addresses infringements "_intended_ to be used in commerce" and does require a showing of intent or knowledge to recover damages--while it totally ignores Section 1114(1)(a), which addresses infringements on goods or services that were _actually_ used in commerce. To recover under either Section 1114(1)(a) or 15 U.S.C. §1125(a), a plaintiff need demonstrate only that defendant's use of a registered mark caused actual confusion, resulting in actual injury to plaintiff (_Zelinski v. Columbia 300, Inc._, 335 F.3d 633, 639 (7th Cir. 2003)).

Because Gallagher alleged that the infringing conduct actually took place in commerce, Gallagher's assertions of intentional and willful conduct on the part of StunFence need not have been proved for Gallagher to recover damages for trademark infringement[8]--and that being so, the exclusions do not apply. That same issue has arisen in other litigation, and the cases have so held in nearly identical circumstances: _Finger Furniture Co. v. Travelers Indem. Co. of Conn._, No. Civ.A. H-01-2797, 2002 WL 32113755, at *13 (S.D. Tex. Aug. 19); _Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co._, 165 F. Supp. 2d 1332, 1341 (S.D. Fla. 2001); _Bay Elec. Supply, Inc. v. Travelers Lloyds_

---

[8] As _Cincinnati Ins. Co. v. E. Atl. Ins. Co._, 260 F.3d 742, 746 (7th Cir. 2001) observed in an analogous setting, "[p]roof of deliberateness would merely be the icing on the cake." Gallagher seems likely to have made allegations of intentional and wilful conduct to seek treble damages and attorneys' fees under 15 U.S.C. §1117, but if it failed to prove those charges, single damages would still have been available to it.

20

Ins. Co., 61 F. Supp. 2d 611, 619 (S.D. Tex. 1999); Union Ins. Co. v. Knife Co., 897 F. Supp. 1213, 1217 (W.D. Ark. 1995).

## Conclusion

In the one area on which the litigants have agreed, it is true that there is no genuine issue of material fact. But in their area of total disagreement, it is StunFence and not Central that is entitled to a judgment as a matter of law: Central had the duty to defend StunFence in the Underlying Action. This case is set for a status hearing at 9 a.m. November 25, 2003 to discuss the still-open issue as to Central's duty to indemnify StunFence as to part or all of any liability incurred in the now-settled Underlying Action.[9]

_____
Milton I. Shadur
Senior United States District Judge

Date:   November 18, 2003

_____

[9]   Nothing in the pleadings or in the Rule 56 cross-motions has spoken to the issue of relief that may arise out of Central's breach of the duty to defend, on which StunFence has now prevailed.